WILLIAM T. P. HOLLINGSWORTH, complainant-respondent,

*v.*

E. ANTON LEDERER and NATIONAL VITA LITE CORPORATION,
a corporation, defendants-appellants.

[Decided February 6th, 1939.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Egan, who filed the following opinion:

"This suit has occupied a considerable period of time due to the necessity of procuring and presenting documentary and oral testimony taken, not only in this country, but in several European countries. Out of the mass of evidence submitted it appears that the complainant and Dr. Anton Lederer were for many years associated in business having to do with filaments for lamps and radio filaments; for low voltage neon tubes and bulbs, and for other luminescent purposes. The doctor was an inventor. He held many patents throughout the world covering lamps, lights and various illuminations. He, and the complainant worked jointly in the development of the patents, and for their license, sale and distribution. While the doctor's work was devoted to inventing and producing, the complainant's business chiefly was to exploit those inventions and productions. In doing so, the complainant traveled extensively in Europe and North America negotiating and contracting with persons or concerns who showed an interest in the inventions.

"The labors of Dr. Lederer were conducted, or performed, in a laboratory located in Vienna, Austria. This laboratory was originally established by Dr. Lederer, Philip Mallory and

the complainant. On September 17th, 1924, they formed a syndicate, or combined in a joint venture, to market the inventions of the doctor. However, before they formally combined, or on May 23d, 1924, they succeeded in effecting an agreement with the General Electric Company regarding certain carbon filament inventions of the doctor. Under the terms of that agreement, the General Electric Company made payments periodically to Mallory for the benefit of the syndicate. Mallory kept the books in which the transactions resulting from the agreement were recorded, and the moneys arising therefrom were by him to be distributed among the parties forming the syndicate. On February 11th, 1927, the General Electric Company terminated its contract with the syndicate and notified the complainant, Dr. Lederer and Mallory that (*Exhibit C-17*):

" 'The General Electric Company has decided not to avail itself of the option given to it in paragraph eleven of its agreement with you dated as of May 23, 1924.'

"On the same day, the General Electric Company directed Morgan Harjes & Co., of Paris, France, to (*Exhibit C-18*):

" 'Please return to Doctor Anton Lederer, Mr. W. T. P. Hollingsworth, and Mr. P. R. Mallory all the assignments to the undersigned of patents and applications for patents which have heretofore been delivered by said Lederer, Hollingsworth and Mallory, to be held by you in escrow and this shall be your authority for so doing.'

"Subsequently, on August 15th, 1927, Mallory accounted for the moneys that he had received from the General Electric Company, and Dr. Lederer acknowledged the receipt of his financial statement in a letter written by him to the complainant which is dated October 24th, 1927 (*Exhibit C-32*).

"The Mallory accounting shows that the Electric Company had paid to the syndicate the sum of $137,500. The complainant says that all of this sum excepting the sum of $123 was paid to the three members of the syndicate, and that Dr. Lederer received his full share thereof, or all that he was entitled to for the operation of the experimental laboratory.

After the accounting of the funds received from the General Electric Company, Mallory withdrew from the syndicate. Written evidence of the dissolution of the syndicate and that the Mallory-General Electric matter was closed appears in an agreement dated October 20th, 1930 (*Exhibit D-73*) made between the complainant and Dr. Lederer, which, in part, reads as follows:

" 'William T. P. Hollingsworth and Doctor Anton Lederer hereby certify their mutual agreement that the laboratory, which is the basis of a contract of September 17, 1924, was the common property of Messrs. W. T. P. Hollingsworth, Doctor Anton Lederer and Philip Mallory, is now in view of Mr. Mallory's retirement *and of the fulfilment of the old agreement of September 17, 1924*, the common property of Messrs. Hollingsworth and Doctor Lederer.' (Italics mine.)

"The syndicate and its activities, I find have no material bearing on the issue. It is mentioned merely for the purpose of presenting a picture of the early joint activities of some of the parties mentioned herein, and to exhibit their course of conduct over a certain period at the end of which began the framework out of which arose the issues upon which this suit is based.

"During the complainant's association with Dr. Lederer he advanced him moneys, it is alleged, amounting in the aggregate to $17,500, which was used, or to be used, by the doctor in connection with his experiments in the laboratory in Vienna, and to finance certain of his inventions involving illumination by electricity. (*Exhibits C-19, C-20, C-21, C-22, C-24, C-25, C-26, C-27* and *C-28*.) The testimony of one of the witnesses for the defendant, Catherine Danzer, the doctor's secretary, is to the effect that payments by the complainant to the doctor amounted to approximately $16,220. It does not appear that any question was ever raised that the relation of creditor and debtor existed between the complainant and the doctor. In fact, on October 23d, 1930, Dr. Lederer wrote to the complainant (*Exhibit C-8*) admitting his indebtedness to him, and then and there proposed giving the complainant, in satisfaction of the indebtedness, an

assignment of a one-third interest in the proceeds of the patents which he held. The patents, however, were subject to a ten per cent. interest held by one Count de Beaufort. In the last mentioned letter, the doctor excepted from his proposal his United States patents. The complainant refused to accept the proposition laid down in *Exhibit C-8* for a one-third share of the patents, and he urged that he was entitled to a fifty per cent. interest in the patents and in the proceeds of all the patents, and in the patent applications held by the doctor throughout the world. No adjustment was thereafter considered until October 12th, 1931, when Dr. Lederer wrote a letter to the complainant (*Exhibit C-4*) and therein again acknowledged his financial obligation to him, and among other things said:

" 'I therefore beg you to accept a half interest *in my inventions and patents for all countries, no matter which,* and in all and everything I may receive therefor from any and all sources, and to give me a full and free quittance for all and any one of my obligations to you to this day.' (Italics mine.)

"The complainant answered that letter by a letter dated October 22d, 1931 (*Exhibit C-5*) in which he accepted the doctor's offer, and said:

" 'I therefore accept your offer to cancel your indebtedness to me of whatever nature and accept in consideration the one-half interest in all moneys which ·may be coming to you under what we may call the neon contracts, no matter from which source, be such payments,. whether on contracts or royalties therefore or by shares in companies or in any way.'

"The complainant received from Dr. Lederer an acknowledgment of this letter of October 22d, 1931, in a letter dated November 12th, 1931 (*Exhibit C-6*), in which Dr. Lederer in part said: 'I am glad to know this matter is settled.' On October 15th, 1931, Dr. Lederer and the complainant executed the following document (*Exhibit C-11*):

" 'Agreements exist among Mr. Hollingsworth, Dr. Lederer and Claude Neon Lights, Inc., New York, for the development and exploitation of Dr. Lederer's inventions, as well for the maintenance of the laboratory in Vienna, Hermesvilla. By these agreements among the

above mentioned parties common rights exist concerning Dr. Lederer's inventions, the patents granted thereon and the applications for patents pending therefor.

"'It is in the common interest of all parties concerned that the continuation of the necessary laboratory work as well as negotiations for the exploitation should not be interrupted by events befalling one of the parties. For this reason, the present agreement should provide that the activity in the common interest should go on without obstacle even if one of the parties should die or be incapable for a longer time to attend to his part of the common work.

"'(1) In case Dr. Lederer should die or become incapable of attending to his agenda for a longer time he bestows already now the following powers upon Miss Catherine A. Danzer, Vienna XIII, Hermes-villa. An exclusive power is given Miss Danzer (that is to say also excluding the heirs after Dr. Lederer) for the following:

"'(a) to take any and all necessary measures concerning the laboratory;

"'(b) to give orders concerning the patent applications for Dr. Lederer's inventions;

"'(c) to conduct negotiations concerning the inventions, patents and applications for patents of Dr. Lederer and to close contracts on these subjects with full validity.'

(A like power was given in case of Mr. Hollingsworth's death).

\*       \*       \*       \*       \*       \*       \*

"'3. Inasmuch as the authorizations given in the foregoing are agreed upon not only in the interest of the constituent but also in the interest of the other party to the agreement these powers are to be irrevocable that is to say they cannot be revoked neither by Dr. Lederer nor by Mr. Hollingsworth nor by their heirs without the consent of the other party to the agreement.'

"The complainant was formerly president, and now is chairman of the board of directors of Claude Neon Lights, Inc. In June, 1927, he persuaded that company to become interested in Dr. Lederer's experimental work. As a result thereof, on August 1st, 1927, a one-year option agreement was given it by the doctor. The option was afterwards renewed on December 24th, 1929, for a further period of three years. Under the option granted, Claude Neon Lights, Inc., advanced Dr. Lederer $1,000 per month for the first year, and $1,600 per month during the next three years for the support of his Vienna laboratory, plus further payments which were to amount to $105,000.

"On December 31st, 1931, Claude Neon Lights, Inc., assigned its option agreement to the General Tube Company. On October 5th, 1932, the option was to expire. It was, however, extended to November 9th, 1932; but the General Tube Lights Corporation sought no renewal of it.

"The agreement of October 20th, 1930 (*Exhibit D-73*) states in paragraph 2:

" 'Mr. Hollingsworth is aware that Doctor Lederer is at the present time under an agreement with Claude Neon Lights, Inc., of New York to execute certain experiments and to work out inventions in the said laboratory. Mr. Hollingsworth permits Doctor Lederer free use of the whole laboratory free of charge for the duration of his work in the interests of the Claude Neon Lights, Inc.'

"On October 1st, 1932, Dr. Lederer died leaving a last will and testament by which he left his entire estate to his wife, Caroline, and to his son, E. Anton Lederer, the defendant. The will named Catherine Danzer of Vienna and General Conrad Randa executrix and executor of his estate. After the doctor's death, his widow and his son, the defendant herein, executed a power of attorney to the said Catherine Danzer giving her full and exclusive authority to negotiate the sale of decedent's patents and applications for patents in all countries; and, in addition, the instrument empowered her to substitute an attorney in her place and stead. She, afterward, for the purpose of carrying out and effecting the disposition of decedent's patents, substituted the complainant as attorney in her place and stead to dispose of, for and on behalf of the decedent's said widow and son, any right, title, interest that they had in decedent's patents and patent applications. (*Exhibit C-10.*)

"The complainant notified the executors of Dr. Lederer's estate and also the widow and son of the decedent, that he, by agreement with Dr. Lederer, held a fifty per cent. interest in all of the doctor's patents and patent applications, and that he had acquired, by assignment, the ten per cent. interest which had been held by Count de Beaufort. The executors and the decedent's widow, and his son, the defendant E. Anton Lederer, refused to concede the complainant's claim

and denied his alleged title. Thereupon, the complainant instituted this suit through which he seeks a decree:

" '(a) Ordering an accounting of transactions involving the inventions in question between defendants E. Anton Lederer, Jr., and National Union Radio Corporation, and the National Vita Lite Corporation;

" '(b) The setting aside of agreements unlawfully entered into between these defendants in derogation of the complainant's rights and interests;

" '(c) A declaratory decree that complainant has the sole right to dispose of the patents and patent applications in question;

" '(d) That out of the fruits thereof a ten per cent. share should first be paid to complainant as assignee of Count Jean de Beaufort, and that the balance should be divided equally between the complainant and the estate of the late Dr. Anton Lederer of Vienna.'

"The title to the patents or rights which appear to be in controversy in this suit are those enumerated in *Exhibit C-3*. That exhibit is an alleged license or conveyance of all of the patents of the late Dr. Lederer to the defendant the National Vita Lite Corporation, which appears to be dated the 6th day of March, 1933, but allegedly was not executed until June 9th, 1933. The patents mentioned in this document are enumerated in paragraph 2 of *Exhibit C-3* and are as follows:

| | |
|---|---|
| Serial No. 158833 | Serial No. 471,986 |
| Serial No. 340027 | Serial No. 503,804 |
| Serial No. 462167 | Serial No. 503,805 |
| Serial No. 468884 | Serial No. 504,138 |
| Serial No. 497025 | Serial No. 508,801 |
| | Serial No. 553,172 |

"The defendant E. Anton Lederer, in effect, said that the complainant's claim to an interest in the patents was somewhat of a surprise to him. In accordance with the power of attorney given him by Catherine Danzer to dispose of the doctor's patents (*Exhibit C-10*), the complainant, on September 21st, 1932, left Houlgate, France, and went to London, England, and negotiated with the British General Electric

Company, Limited, regarding the patents and consummated a contract with it, which the defendants admit. Count de Beaufort assisted in those negotiations and was paid something in connection therewith. Miss Danzer questioned the complainant's claim for compensation, but finally allowed it (*Exhibit C-16*). Then, again, the complainant, under his power of attorney, negotiated with the American General Electric Company, through its representative, Judge Woodward in Houlgate, France, in the summer of 1932. Miss Danzer was then present at the negotiations. Later, on June 6th, 1933, the defendant E. Anton Lederer and the complainant conferred with the representatives of the General Electric Company in their New York office about those patents. The consideration then mentioned in the General Electric negotiations was $150,000. The defendant E. Anton Lederer told the complainant that out of the sum he would give him $30,000 as his share. That sum the complainant refused to accept. The offer and its rejection developed the 'parting of the ways' in business between the complainant and the defendant E. Anton Lederer. E. Anton testified about the General Electric negotiations as follows:

" 'Q. Do you recall mentioning in the conversation at the General Electric Company the sum of a hundred and fifty thousand dollars in connection with these contracts, or rather these patents? A. I guess I did mention a figure. Q. A hundred and fifty thousand dollars? A. I guess so. Q. Do you recall suggesting that Mr. Hollingsworth have a thirty thousand dollar share of that and you and your mother, or your father's estate, having the balance of a hundred and twenty thousand? A. I recall I made the suggestion that Mr. Hollingsworth should get about thirty thousand dollars.'

"The complainant at the related conference of June 6th, 1933, practically effected an agreement with the American General Electric Company; but the defendant E. Anton Lederer by letter dated June 12th, 1933, to Mr. Evans of the patent department of the General Electric Company, 120 Broadway, New York, 'upset' and destroyed the result of the negotiations and refused to come to any terms with the company (*Exhibit C-2*).

"The evidence shows that while the negotiations by E. Anton Lederer and Hollingsworth with the General Electric Company on June 6th, 1933, were being conducted, E. Anton, without the knowledge of the complainant, had been secretly conferring and contracting with the defendants National Union Radio Corporation, and National Vita Lite Corporation, or their officers and employes, to develop and exploit the patents, and patent applications, of the decedent. He, on March 6th, 1933, had, in fact, entered into a written licensing agreement with the defendant National Vita Lite Corporation, regarding the patents and applications for patents of the decedent (*Exhibit C-3*). This licensing agreement antedated the corporate existence of the National Vita Lite Corporation; that corporation did not come into being until May 13th, 1933 (*Exhibit C-12*).

"It will be observed that the agreement with the National Vita Lite Corporation, *Exhibit C-3,* is dated March 6th, 1933, while at the end of the agreement, appears the date of June 19th, 1933, which is one week after E. Anton wrote his letter of June 12th, 1933, to the General Electric Company (*Exhibit C-2*) announcing his withdrawal from the negotiations with them 'because of circumstances which are beyond my control.' There is in evidence a letter (*Exhibit D-47*) dated June 12th, 1933 (the same date as *Exhibit C-2*), written by the defendant E. Anton to the complainant, which, among other things, said: 'I object to your negotiating with General Electric Company until the above request is considered.' The 'request' seems to have consisted of a demand by the defendant E. Anton that the complainant use his influence with the Claude Neon Lights, Inc., to pay the Lederer estate moneys which it claimed was due it from the Neon Lights corporation under the option agreement. Part of the defendant Lederer's testimony relating to the situation described in the last mentioned exhibit is as follows (page 306, testimony) :

" '*Q*. Did the two things have anything to do with each other? *A*. No. * * * *Q*. In other words, you wanted to force Mr. Hollingsworth to use his influence with the Claude Neon Company before you would permit him to go ahead with

the General Electric Company matter? *A*. That was just a matter of recalling to his mind that certain things ought to be settled before further negotiations were to be commenced. *Q*. The two things you agree had nothing to do with each other? *A*. All right, they had nothing to do with each other.'

"E. Anton Lederer's whole attitude at the General Electric conference of June 6th, 1933, does not lend credit to his appreciation of fairness or justice; it was not so much what he there said, as what he there omitted to say. Prior to his entering that conference, as above stated, he had been negotiating, and had practically concluded, an agreement with certain persons interested in forming a corporation for the purpose of obtaining licenses for the doctor's patents, the legal title to which were, and still are, in the executors of the estate of the doctor in accordance with the patent laws of the United States. He remained at the conference and took part in the negotiations conducted by the complainant with the General Electric Company and at no time did he make known his secret activities with the National Vita Lite Corporation to either the complainant, or to the representatives of the General Electric Company. He remained willfully silent when he was clearly under a duty to speak. His conduct cannot be justified. He now takes the position that the power of attorney given by Miss Danzer to the complainant had been canceled and that, subsequently, he received the power of attorney from Miss Danzer, which is the same as the complainant's power, to issue licenses for the patents and the patent applications. He did not make any announcement at the General Electric conference that he had acquired the power of attorney. On the contrary, he stood by, and to all appearances, acquiesced in the complainant's right to negotiate. He raised no voice of protest whatever against the complainant's procedure. The complainant claims an irrevocable power under the power of attorney given him by Miss Danzer. I am satisfied his claim is not unwarranted under the facts in this suit. I believe the complainant has a property interest associated with his power of attorney. I think without doubt he has a power coupled with an interest, and,

therefore, his power is irrevocable. (*Exhibits C-4, C-5, C-10.*) *49 C. J. 1252, ¶ 12d; 49 C. J. 1255, ¶ 20a; 49 C. J. 1256, ¶ 21b.*

"I am satisfied that the letter of Dr. Lederer, dated October 12th, 1931, to the complainant, gave to the complainant what is clearly expressed therein—a '*half interest in my inventions and patents for all countries, no matter which,* and in all and everything I may receive therefrom * * *.' I do not believe that the complainant in his reply letter of October 22d, 1931 (*Exhibit C-5*), limited his one-half to what moneys would, or might, arise from the 'Neon contracts.' The complainant's subsequent efforts with the British General Electric Company and the American General Electric Company negative the suggestion that he was interested only in exploiting the patents with the Neon Lights, Inc. If he were interested solely in the 'Neon' contracts, what could have been the consideration for his activities with the British General Electric Company and the American General Electric Company? I am convinced that the complainant received from the doctor a fifty per cent. interest in all of his patents which he held, no matter where they were.

"There is some testimony on the part of the defendant E. Anton Lederer, regarding the disposition of the Canadian rights to the inventions in question, or some of them. I can see no relation between that transaction and the issue in the instant case, beyond, possibly, the fact that it shows business dealings between the complainant and the decedent, Dr. Lederer. That transaction shows their interests were approximately equal. The proceeds of the Canadian transaction was $15,000, one-half of which was paid to the General Tube Light Corporation; the balance of $7,500, in Canadian currency, netted in American dollars a sum of $6,700. The complainant received as his share thereof $3,350; and Dr. Lederer received the same amount. Miss Danzer admitted that the doctor received that sum.

"It is charged that the defendant National Vita Lite Corporation appears to be a subsidiary, an affiliate, or a nominee of the defendant National Union Radio Corporation. It is

alleged that the president of the National Union Radio Corporation, Mr. Peters, is the treasurer of the National Vita Lite Corporation; Henry Hutchings, who is an employe of the National Union Radio Corporation, is also president of the defendant National Vita Lite Corporation; the defendant E. Anton Lederer is the chief engineer of the National Union Radio Corporation and is also the vice-president of the National Vita Lite Corporation; the National Union Radio Corporation had a forty-five per cent. stock interest in the National Vita Lite Corporation; and that between both corporations there is an interlocking board of directors. The defendant the National Vita Lite Corporation has its place of business in the factory of the defendant the National Union Radio Corporation, at No. 360 Ogden street, Newark, New Jersey. The sales offices of both corporations are in the same room at No. 400 Madison avenue, New York City. To sustain his point counsel for the complainant refers to *1 Fletcher Cyclopedia Corporations 61, 63* §§ *44, 45,* which states that the courts have uniformly held there is no magic in incorporation and that 'the legal fiction of distinct corporate existence may also be disregarded in a case where a corporation is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, conduit or adjunct of another corporation. "Courts no longer hesitate to look through forms to substance, to ignore a mere colorable corporate entity to the end that rights of third parties shall be protected." '

"I am convinced that the defendant E. Anton Lederer, when he represented in his contract with the defendant the National Vita Lite Corporation, that the patents and applications 'are unencumbered, free and clear from any claims or liens of any kind' (*Exhibit C-3,* paragraph 3, page 1) knew that his representations were false. I am satisfied he knew at the time that the complainant had an equal one-half share with his father in the patents, and the patent applications; both shares being subject to the one-tenth interest in the proceeds arising therefrom, which was held by Count de Beaufort. (The one-tenth interest of the Count de Beaufort

being assigned to the complainant, as already stated herein. *Exhibits C-4, C-5, C-6* and *C-7*.) I am satisfied from all the facts and circumstances that the knowledge of the defendant was conveyed to the corporate defendant the National Vita Lite Corporation, he being vice-president of that corporation. It has been held, 'that the corporation is affected with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority, and the corporation is charged with such knowledge even though the officer or agent does not in fact communicate his knowledge to the corporation.' *14a C. J. 482 ¶ 2350, 12a.* See *Vulcan Detinning Co.* v. *American Can Co., 70 N. J. Eq. 588; 72 N. J. Eq. 387; 62 Atl. Rep. 881; Schenck* v. *Mercer County Mutual Fire Insurance Co., 24 N. J. Law 447; Atlantic City* v. *Atlantic City Pier Co., 62 N. J. Eq. 139; Trenton Banking* v. *Woodruff, 2 N. J. Eq. 117.*

"This rule appears to apply to vice-presidents, agents or managing agents, or 'any other officer or agent who acquires such notice or knowledge concerning matters pertaining to his department or scope of authority.' *14a C. J. 484 ¶ 2351b* See *Todd* v. *Exeter Land Co., 103 N. J. Eq. 268; 104 N. J. Eq. 431; Hercules Powder* v. *Nieratko, 113 N. J. Law 195; Gaston* v. *American Exchange National Bank, 29 N. J. Eq. 98; Willard* v. *Denise, 50 N. J. Eq. 482; 26 Atl. Rep. 29.*

" 'If any officer or agent acting within the general scope of his powers acquires knowledge of a particular fact while committing a fraud upon a third person in a matter pertaining to the business of the corporation, although the fraud is perpetrated for his own benefit, the corporation will be imputable with such knowledge, as well as with knowledge of the fraud, especially where it ratifies the transaction.' *14a C. J. 493 ¶ 2361g.* See *Trenton Street Railway Co.* v. *Lawlor, 74 N. J. Eq. 828; 71 Atl. Rep. 234; Erie Railroad Co.* v. *S. J. Groves & Sons Co., 114 N. J. Law 216; 176 Atl. Rep. 377; Internal Water Heater Co.* v. *Burns Bros., 114 N. J. Law 368; Elfenbein* v. *Luckenbach Terminals, Inc., 111 N. J. Law 67.*

"Under all the facts and circumstances, I believe that equity and justice demand that the licensing agreement entered into with the National Vita Lite Corporation should be set aside as to the complainant. But I can find no evidence that the defendant the National Union Radio Corporation is culpable. The allegations against it in the complaint have not been sustained. I do believe, however, that the National Union Radio Corporation was properly joined as a party defendant. The suit as to it will be dismissed without costs.

"I find no force in the arguments of the defense that Dr. Lederer, because of the option by him given to, and held by, the Claude Neon Lights, Inc., had no power to convey an interest in his patent interests to the complainant. Certainly, the fifty per cent. interest given by Dr. Lederer to the complainant under the circumstances was subject to any right or title that the Claude Neon Lights may have had in the patents. The interests of Dr. Lederer only were affected—and those to the extent of fifty per cent. of the proceeds that would come to him from the exercise of the option by the Claude Neon Lights, Inc. The consideration for the gift from Dr. Lederer to the complainant, was moneys advanced by the complainant to Dr. Lederer and the exploitation of the patents and the work and services in connection therewith by the complainant, as hereinbefore stated. The contention of the defendants that the complainant paid no part of the patent fees in the United Sates is without force since the legal title to the patents was in the doctor, and since his death, in his estate. It can be said that there is testimony, however, that the complainant requested Miss Danzer, the executrix of the decedent's estate, for an itemized list of the patent expenses so that he could assist in sharing the patent expenses; but it appears that Miss Danzer never supplied any such list to the complainant. It may here be stated that there are no annual fees on United States patents; but such is not the case in Great Britain.

"Counsel for the defendant belatedly raised the point that evidence was received in the instant case in violation of sec-

tion 4 of the Evidence act. Quite some weeks after the hearing was concluded, and during the course of his final summation, he said 'I register two general impressions, and one is that this case violates section 4 of the Evidence act. As I read the testimony the claims of the complainant really appeared on the surface after the one man who could say the claim was bad or indifferent was dead—Lederer. And * * * if section 4 of the Evidence act had been applied to this case the case must of necessity have collapsed, because the complainant could not have proved his case except by transactions with the decedent.'

"Counsel, to sustain his point, cited *Kempton* v. *Bartine*, *59 N. J. Eq. 149*. He further said, 'Now, I realize also that no objection was made timely, and I have in mind the case of *Rowland* v. *Rowland*, *40 N. J. Eq. 281*, wherein the court said that if timely objection was not made the court could not exclude the testimony under the circumstances.'

"Counsel has supplied the answer to the point he raised at the outset of his summation—that no objection was raised during the course of the hearing, that the reception of the testimony was contrary to the provisions of section 4 of the Evidence act. However, the evidence received affecting the relations of complainant with the decedent have been closely and carefully scrutinized. In *Grannan* v. *Fox, 100 N. J. Law 288*, the late Chancellor Walker said in part: 'If admitted without objection, it is not in the power of the court afterward to strike out.' Counsel for the defense states the question and furnishes the answer. 'Raising no objection to its admission, it is not in the power of the court to strike it out.'

"The defendant insists that the defendant Lederer is sued in a representative capacity. Such is denied by the complainant, who says that the defendant Lederer has no representative status since his father's exploitation agreement of October 15th, 1931 (*Exhibit C-11*), specifically excludes heirs; and, also, because the power of attorney of August 19th, 1932 (*Exhibit C-10*) is irrevocable. In *Burr* v. *Bloomsburg, 101 N. J. Eq. 615, 624*, it is said that 'the test of representa-

tive capacity was "whether the one party or the other appeared on the record as a representative of the deceased." ' And that 'where devisees are sued as owners of chattels in relation to which equitable rights are claimed, evidence of transactions with the decedent are not barred as being sued in a representative capacity. Such devisees are not considered as being sued in a representative capacity.'

"Furthermore, the complainant's case has as its foundation the letters of the decedent, *Exhibits C-4* and *C-5*, and the executed documents, *Exhibits C-10* and *C-11;* all of these written instruments strongly support the position of the complainant.

"The court during the course of the hearing, at no time overlooked the principles laid down by the court of errors and appeals in the case of *Bankers Trust Co.* v. *Bank of Rockville Centre Trust Co., 114 N. J. Eq. 391,* where Mr. Justice Heher, speaking for the court, said:

" 'The bar of the statute extends to all transactions with, or statements by, the testator or intestate represented in the action, unless the representative offers himself as a witness on his own behalf, and testifies to a transaction with or statement by his testator or intestate. The design of the rule of evidence prescribed by this statute is to produce equality between the parties, by silencing the one who may, by his own mouth, be able to testify to transactions and conversations with the decedent, possibly to the disadvantage of his estate, unless the representative of that estate should by his own conduct, remove the interdict. *Hoffman* v. *Maloratsky, 112 N. J. Eq. 333.* The test laid down for ascertaining what is a "transaction with" the deceased, within the intendment of the statute, is "to inquire whether, in case the witness testified falsely, the deceased, if living, could contradict it of his own knowledge." *Van Wagenen* v. *Bonnot, 74 N. J. Eq. 843; Campbell* v. *Akarman, 83 N. J. Law 567.'*

"Could the decedent, Dr. Lederer, if living, under the circumstances, deny that he wrote or subscribed the communications upon which the complainant's suit is based? I think not.

210

"I feel there is no merit to the counter-claim of the defendant E. Anton Lederer which is based on the 1924-1927 Mallory-General Electric Syndicate. The Mallory-General Electric Syndicate is entirely without the issue in the instant case. The patents involved in that syndicate covered lamp filaments which are not involved herein. I do not believe the counterclaim is germane to the issue herein and it will be dismissed without prejudice.

"I am convinced from all the mass of exhibits and from all the testimony, both oral and written, submitted in this suit that the complainant is entitled to a decree. I shall advise a decree directing (1) an accounting of all moneys and profits received from the National Vita Lite Corporation agreements covering the licensing of patents and the applications for patents; (2) that complainant is entitled as assignee of Count de Beaufort to the ten per cent. interest in the proceeds; (3) that the complainant is entitled to a fifty per cent. interest in the remainder under his agreement with the decedent, Dr. Lederer; (4) that in consequence of arrangements and agreements with Dr. Lederer, the complainant has the sole right of exploiting, bargaining, selling and licensing the patents and patent applications in question; (5) the power of attorney given to the complainant by Catherine Danzer, hereinbefore mentioned, is world wide in scope and is coupled with an interest which cannot be revoked and it is now in full force and effect; (6) that the alleged power of attorney given by Miss Danzer as executrix to the defendant E. Anton Lederer is void and of no effect; (7) that the patents and patent applications in question be impounded pending their disposition and the further order of the court; (8) that the agreements entered into by the defendants under dates of March 6th, 1933, and June 9th, 1933 (*Exhibit C-3*) are void and without effect; (9) that the complainant be authorized to dispose of the patents and inventions involved in this suit free from any claim by the defendants except that the estate of Dr. Lederer shall be entitled to receive forty-five per cent. of the net proceeds."

*Mr. Harold M. Kain and Mr. William L. Bowman,* (of the New York bar), for the appellant E. Anton Lederer.

*Messrs. Stickel & Stickel (Mr. Fred G. Stickel, Jr.,* of counsel), for the appellant National Vita Lite Corporation.

*Mr. John D. McMaster,* for the respondent.

PER CURIAM.

We have carefully examined the proofs and the law applicable thereto, and are entirely satisfied that Vice-Chancellor Egan reached a right result.

Accordingly the decree is affirmed, with costs.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, BODINE, DONGES, PERSKIE, PORTER, HETFIELD, DEAR, WELLS, WOLFSKEIL, RAFFERTY, WALKER, JJ.  13.

*For modification*—CASE, HEHER, JJ.  2.